# LOT AGREEMENT

THIS LOT AGREEMENT ("Agreement") is entered into upon the undersigned LOT User's submission of a signed copy of the completed Agreement to the LOT Administrator, and is effective as to that LOT User upon the date of such submission (the "Effective Date"), whereby such LOT User becomes a party to this Agreement on behalf of itself and its Affiliates and becomes bound by the terms and conditions. This Agreement is by and between the undersigned LOT User and all other current and future LOT Users.

NOW THEREFORE, each LOT User agrees as follows.

**1. License Grant and Release**

1.1. With respect to each of its Subject Patents, and subject to the conditions and limitations of this Agreement, each Licensor hereby grants to every Licensee a present, fully vested and irrevocable (except as provided in Section 2 below):

(a) worldwide, royalty-free, non-exclusive, non-sublicensable, non-transferable (subject to the provisions of Section 2 below) license to make, have made, operate, have operated, use, sell, offer for sale, import, and otherwise distribute Products and Services at any time on or after any Transfer of the respective Subject Patent to an Assertion Entity; and

(b) release, effective immediately prior to first Transfer of the respective Subject Patent to an Assertion Entity, of any and all claims, liabilities and damages for all Infringement of the respective Subject Patent occurring prior to the date of such Transfer of the respective Subject Patent.

1.2. With respect to each Subject Patent of the Licensor, the License constitutes a present, fully vested and irrevocable (except as provided in Section 2 below) waiver of the right under the respective Subject Patent for any Assertion Entity to make any Patent Assertion of the respective Subject Patent against any Licensee or with respect to any Licensee's Products and Services. The License further includes immunity following first Transfer of the respective Subject Patent to an Assertion Entity for use, reproduction, and further sale, offer for sale, and distribution of the Licensee's Products and Services by a distributor, reseller, re-licensor or customer of the Licensee, including reproduction and distribution of authorized copies of software sold or otherwise distributed (including by license of copies) by such Licensee.

1.3. No Other Rights. Except as expressly set forth in Sections 1 and 2 no license or right under any Patents is granted by this Agreement, whether by implication, estoppel, or otherwise. For the avoidance of doubt, the Licenses do not release any claims, liabilities or damages for Infringement or otherwise restrict or limit any Patent Assertion of a Subject Patent that has not been Transferred to an Assertion Entity, including against any Licensee or with respect to any Licensee's Products and Services.

1.4. Return of Financial Benefit. Each LOT User agrees that any payment due to or received by such LOT User or its Affiliates (a "Receiving LOT User"), after becoming a LOT User or its Affiliate, resulting from any Patent Assertion by an Assertion Entity against an entity that at the time of the Patent Assertion is a LOT User or its Affiliate (a "Paying LOT User"), to the extent that such Patent Assertion is based on any of the Receiving LOT User's Patents that were Transferred by the Receiving LOT User to an Assertion Entity less than two (2) years prior

# LOT AGREEMENT

to the Receiving LOT User becoming a LOT User or its Affiliate (and where the payment due or received is not the result of an agreement between the Receiving LOT User and the Paying LOT User), will be immediately cancelled or returned to the Paying LOT User against whom such Patent Assertion is made.

1.5. Full Force and Effect. All Licenses granted in this Agreement are intended to and shall run with the Subject Patents to which they pertain for the full duration of such Subject Patents and be binding on subsequent owners and licensees. Any transfer or grant of rights in or to a Licensor's Subject Patent(s), whether by such Licensor or any subsequent transferee, shall be subject to the Licenses and continuing obligations of this Agreement with respect to such Subject Patent(s).

**2. Assignment, Change of Control, Withdrawal and Amendment**
2.1. Subject to the provisions of Section 2.2 below and except as set forth in the next sentence, no LOT User, Licensor or Licensee or their respective Affiliates may assign this Agreement or its rights hereunder, including but not limited to by operation of law, and any attempt to do so shall be void. A LOT User may assign this Agreement to its Affiliate solely as necessary to effect a corporate reorganization of such LOT User that does not constitute a Change of Control.

2.2. Change of Control.

(a) LOT User. In the event that a LOT User undergoes a Change of Control, whether during or after its Participation Period, by an acquirer that (i) is not a Financial Investor, and (ii) is not and does not become a LOT User or an Affiliate of a LOT User within its Participation Period during the six (6) month period after the effective date of such Change of Control, then the LOT User and all of its Affiliates will be deemed to have withdrawn from this Agreement, effective six (6) months after the effective date of such Change of Control. Notwithstanding Section 6.1, an acquirer and its Affiliates prior to the Change of Control will not be considered to become an Affiliate of the LOT User under this Agreement merely by virtue of having acquired Control of the LOT User.

(b) Affiliate of a LOT User. If an Entity ceases to be an Affiliate of a LOT User and does not become a LOT User prior to the time it ceases to be an Affiliate, then such Entity will be deemed to have withdrawn from this Agreement, effective as of the date it ceases to be an Affiliate of the respective LOT User.

(c) Notice. In order to allow the LOT Administrator to determine a withdrawal date under this Section 2.2, the LOT User agrees to inform the LOT Administrator within thirty (30) days of a Change of Control of the LOT User of the fact of such Change of Control and its respective effective date.

2.3. Withdrawal. A LOT User may withdraw from this Agreement by sending the LOT Administrator a written announcement that declares the LOT User's intent to withdraw and is signed and submitted by an authorized representative of the LOT User. The existence and date of each such announcement will be published on the LOT website. The LOT User's withdrawal will be effective as to such LOT User and all of its Affiliates six (6) months after it sends the withdrawal announcement.

2.4. Scope of Rights Following Effective Date of Withdrawal.

# LOT AGREEMENT

(a) Inbound Licenses. The Licenses granted to a LOT User or its Affiliate that has or is deemed to have withdrawn will remain in effect only with respect to Subject Patents of Licensors that were Transferred to an Assertion Entity prior to the date on which such withdrawal is effective.

(b) Outbound Licenses. All Patents of a LOT User or its Affiliate that are Subject Patents as of the date on which withdrawal or deemed withdrawal is effective as to such Entity shall remain Subject Patents and will remain and continue to be licensed following withdrawal to all Licensees existing as of the date of withdrawal and to all Licensees that become an Affiliate of an existing Licensee after the date of withdrawal, subject to the terms and conditions of this Agreement, including Subject Patents Transferred to an Assertion Entity after the date on which withdrawal is effective.

2.5. Amendment. Provisions regarding amendment of this Agreement are set forth in Exhibit B, incorporated into this Agreement as if fully set forth herein.

## 3. Warranties

3.1. Disclaimer. EACH LICENSOR OFFERS THE PATENT LICENSES GRANTED HEREIN "AS IS" AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND CONCERNING ITS PATENTS.

3.2. Representations and Warranties. Notwithstanding Section 3.1, each LOT User represents and warrants that:

(a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and that it has the full right and power to grant the licenses, waivers, immunities, covenants and releases set forth herein;

(b) this Agreement has been duly authorized, executed and delivered by such LOT User and is enforceable against such LOT User;

(c) it has and covenants that it will continue to have and exercise the rights necessary to cause its Affiliates to be bound by the obligations of this LOT Agreement (including the obligation to grant the Licenses with respect to the Subject Patents in accordance herewith); and

(d) it will not use or cooperate with any Financial Investors, Holding Companies, or non-Participating Business Groups for the primary purpose of circumventing its obligations under this Agreement.

## 4. Disclaimer of Liability

IN NO EVENT SHALL ANY LOT USER OR ANY OF ITS AFFILIATES BE LIABLE UNDER THIS AGREEMENT, OR BY VIRTUE OF GRANTING ANY LICENSES HEREUNDER, FOR ANY INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, OR FOR ANY OTHER PUNITIVE OR SPECIAL DAMAGES, WHETHER UNDER A THEORY OF WARRANTY, CONTRACT, NEGLIGENCE, OR OTHERWISE, EVEN IF SUCH LOT USER OR ANY OF ITS AFFILIATES HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES PRIOR TO SUCH AN OCCURRENCE.

## 5. Miscellaneous

# LOT AGREEMENT

5.1. Relationship of the Parties. This Agreement does not create any relationship of agency, partnership or joint venture among the LOT Users or their Affiliates.

5.2. No Impact on Reasonable Royalty or Equitable Relief. Each LOT User and its Affiliates agree that this Agreement does not reflect a royalty that any LOT User or its Affiliate might otherwise have negotiated with respect to any Subject Patents. Each LOT User and its Affiliates further agrees that this Agreement is not intended to, and they will not argue that this Agreement is, relevant to whether an injunction is available or what would constitute a reasonable royalty or a measure of damages for Infringement of any Subject Patents in any dispute outside the scope of this Agreement.

5.3. Third Party Beneficiaries. Each LOT User and each of its Affiliates is an intended third party beneficiary of this Agreement. Except as expressly provided herein, nothing in this Agreement is intended or shall be construed to give any Entity, other than LOT Users and their Affiliates, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

5.4. Entire Agreement. This Agreement constitutes the entire agreement and understanding of the LOT Users and their Affiliates with respect to the subject matter hereof.

5.5. Bankruptcy. Each LOT User acknowledges and agrees that from and after the Effective Date, and notwithstanding any limitations or conditions in Section 1 or 2 that may apply, (i) this Agreement is an executory contract as that term is used in Section 365 of the United States Bankruptcy Code; (ii) the License granted by each Licensor to each Licensee under this Agreement is subject to Section 365(n) of the Bankruptcy Code; (iii) for the purposes of Section 365(n) of the Bankruptcy Code, the Subject Patents constitute "intellectual property" within the scope of Section 101 of the Bankruptcy Code; and (iv) in the event that any bankruptcy is filed by or against a Licensor, or the Licensor is adjudged bankrupt or insolvent, and the trustee in such bankruptcy rejects this Agreement, each Licensee will have the right to exercise all rights provided by Section 365(n), including but not limited to the right to retain its license rights under this Agreement and any agreement supplementary to this Agreement.

5.6. Costs. LOT Users will pay fees for ongoing costs and operation of LOT Network Inc. and the LOT Administrator in accordance with Exhibit A.

5.7. General Release Waiver. With respect to the releases granted by it in this LOT Agreement, each Licensor voluntarily and with full knowledge of its significance, expressly waives and relinquishes any and all rights they may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on releases. SPECIFICALLY, EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 1542 WHICH PROVIDES THAT: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

5.8. Release for LOT Administrator and LOT Network Inc. Each LOT User releases the LOT Administrator, LOT Network Inc. and their directors, representatives and successors from, and covenants not to bring, any claim or action with respect to, any liability associated with their administration of this Agreement.

# LOT AGREEMENT

5.9. Notice. All notices and communications pursuant to this Agreement shall be in writing and signed by the Entity giving such notice and shall be deemed to have been given upon receipt or upon tender by electronic mail with a follow-on hardcopy using a priority or express courier, postage prepaid to the noticed party as follows: (a) in the case of the undersigned LOT User, to the email and mailing addresses provided on the signature page hereto, which addresses may be updated by notice from such LOT User to the LOT Administrator; and (b) in the case of the LOT Administrator, to the email and mailing addresses for the LOT Administrator as of the date of notice as specified on the LOT website.

5.10. Section Headings. The Section headings contained in this Agreement are for reference purposes only and shall not in any way control the meaning or interpretation of this Agreement.

5.11. Governing Law. This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to its choice of law principles.

## 6. Definitions

6.1. "Affiliate" means, with respect to a first Entity, any Entity that, now or in the future, directly or indirectly Controls, is Controlled by, or is under common Control with such first Entity, but only for so long as such Control exists; provided, however, that:

(a) in the event that a LOT User is or becomes Controlled by a Financial Investor, then such Financial Investor (and any Entities that (i) are Controlled by such Financial Investor, (ii) are only affiliated with the LOT User because of their common Control by that Financial Investor and are not Entities Controlled by such LOT User, and (iii) do not exist for the primary purpose of attempting to avoid having Patents be subject to this Agreement) will not be considered Affiliates of such LOT User for so long as such Financial Investor remains a non-Assertion Entity; and

(b) in the event that a LOT User is or becomes Controlled by an Entity ("Holding Company") that Controls a group of Entities that conduct substantially separate and identifiable businesses (each such Entity and its Controlled Affiliates, a "Business Group"), then such Holding Company (and any Entities that (i) are Controlled by such Holding Company, (ii) are not Affiliates of such LOT User other than because of their common Control by such Holding Company, and (iii) do not exist for the primary purpose of attempting to avoid having Patents be subject to this Agreement) will not be considered Affiliates of such LOT User for so long as such Holding Company remains a non-Assertion Entity, provided that one or more of the Business Groups that becomes a LOT User together with its Controlled Affiliates ("Participating Business Groups") (x) owns or controls at least 10,000 active U.S. Subject Patents at the time of becoming a LOT User, and (y) has aggregate consolidated revenues, exclusive of revenue derived from Patent Assertions, measured over the full twelve (12) months preceding the date it becomes a LOT User of greater than $1 billion. Any such LOT User will confirm whether it is subject to this Section 6.1(b) upon written request from another LOT User.

6.2. "Assertion Entity" means an Entity and each one of its Affiliates if such Entity and all its Affiliates collectively derived from Patent Assertion more than half of their total consolidated gross revenue measured over the full twelve (12) months preceding a particular date (other than as a result, during such twelve (12) month period, of a damages award or settlement obtained in such period from patent infringement proceedings brought by such Entity or its Affiliates against one or more other Entities based on such other Entities' sale or distribution of one or more

infringing products or services that compete against one or more bona fide commercial products or services of such Entity or its Affiliates, provided that such Entity and all its Affiliates collectively did not derive (or were not awarded or did not otherwise obtain the right to derive pursuant to a settlement) from Patent Assertion an amount equaling more than half of their total consolidated gross revenue measured over the full twenty-four (24) months preceding the particular date). Without limiting the foregoing, the following will be counted as revenue derived by an Entity from Patent Assertion for purposes of this definition, including where derived by any other Entity in respect of such Entity's Patents:

(i) royalties and other monetary compensation (or the value of non-monetary compensation) arising from grant of releases, licenses, covenants not to sue or other rights to Patent(s) for the purpose of deriving royalties or other monetary compensation under such Patent(s), where such rights are not granted in connection with Products and Services provided by such Entity or its Affiliates relating to such Patent(s) (which shall be counted as revenue at the time of an agreement in principle to grant the Patent rights),

(ii) monetary compensation (or the value of non-monetary compensation) arising from settlement of Patent Assertion (which shall be counted as revenue at the time of an agreement in principle to grant the Patent rights ),

(iii) damages awarded arising from a Patent Assertion (which shall be counted as revenue at the time of award, even if not collected), and

(iv) imputed revenue of $500,000 in any 12 month period for each Infringement complaint filed for a Patent Assertion (which shall be counted as revenue at the time of filing through final resolution of such Patent Assertion). In the event an Entity and all its Affiliates meet any of the criteria specified in this Section 6.2, then such Entity and all its Affiliates will be deemed to be an Assertion Entity as of the date of the first allegedly infringing activities giving rise to the Patent Assertion resulting in such criteria being met, regardless of whether it meets any of the other criteria in this definition.

In addition, an Entity and each of its Affiliates will be deemed to be an Assertion Entity, regardless of whether it meets any of the other criteria in this Section 6.2, if the Entity or any of its Affiliates has, as of a particular date, a goal or plan approved by senior management or a senior executive (or under which the Entity has begun to receive revenue) to derive from Patent Assertion, either directly, or indirectly through one or more of its Affiliates, more than half of the total consolidated gross revenue of such Entity and its Affiliates collectively in any twelve (12) month period including or after that particular date.

For purposes of this Section 6.2, if an Entity is or becomes Controlled by a Financial Investor, then "Affiliates" exclude that Financial Investor, as well as other Entities which (i) are Controlled by that Financial Investor, (ii) are only affiliated with the first Entity because of their common Control by that Financial Investor and are not Entities Controlled by such first Entity, and (iii) do not exist for the primary purpose of attempting to avoid having Patents be subject to this Agreement.

6.3. "Change of Control" means, with respect to a first Entity:

# LOT AGREEMENT

(a) direct or indirect acquisition (except for transactions described in clause (b) below), whether in one or a series of transactions, by a second Entity or related Entities of Control of the first Entity; or

(b) a merger, consolidation or other reorganization or recapitalization of the first Entity with a second Entity or a direct or indirect subsidiary of such second Entity, provided that a result of the consummation of such merger, consolidation or other reorganization or recapitalization, whether in one or a series of related transactions, is that the holders of Control of the first Entity immediately prior to such consummation do not Control, immediately after the consummation, the Entity surviving such merger, consolidation or other reorganization or recapitalization, or its direct or indirect parent Entity. The "effective date" of a Change of Control is the date on which the relevant acquisition, merger, consolidation, reorganization or recapitalization (as applicable) occurs under applicable law.

6.4. "Control" means (i) the ownership, or the direct or indirect control, of more than fifty percent (50%) of the voting stock or other voting ownership interest of an Entity, or (ii) the sole power to elect, appoint, or cause the election or appointment of, directly or indirectly, at least a majority of the members of the board of directors (or such other governing body that exercises a similar level of control) of an Entity. The terms "Controlled" and "Controls" shall have a correlative meaning.

6.5. "Entity" means an individual, corporation, trust, partnership, joint venture, limited liability company, association, unincorporated organization, or other legal or governmental entity.

6.6. "Financial Investor" means an Entity that is not an Assertion Entity and its primary business is investing in equity securities or debt of non-Assertion Entities (examples of a Financial Investor are a venture capital firm, an investment fund, a mutual fund, an investment company, or a private equity firm).

6.7. "Infringement" means direct or indirect infringement of a Patent.

6.8. "License" means the license rights, releases, waivers and immunities granted in Sections 1 and 2 of this Agreement, subject to the terms, conditions and limitations herein.

6.9. "Licensee" means, with respect to each Subject Patent of a Licensor: (i) each LOT User who is within its Participation Period at any time that the respective Licensor or any assignee, transferee or successor has, or after which the Licensor or any assignee, transferee or successor later obtains, the right to grant licenses, releases, waivers or immunities with respect to such Subject Patent of or within the scope granted in the License; and (ii) each Affiliate of such LOT User that is or becomes an Affiliate of the LOT User at any time during such LOT User's Participation Period, subject to Sections 2 as applicable.

6.10. "Licensor" means a LOT User and each Entity that is, was, or becomes, an Affiliate of such LOT User during the LOT User's Participation Period. For avoidance of doubt, each LOT User and each of its Affiliates referenced in the prior sentence shall remain a Licensor with respect to its Subject Patents, even after submission of a withdrawal announcement as set forth in Section 2.3 or Limitation Announcement as set forth in Exhibit B.

6.11. "LOT Administrator" means LOT Network Inc. or other Entity appointed by LOT Network Inc. or its successor that administers the LOT website, including receiving and publishing on the LOT website the name of Entities that submit this Agreement, withdrawal announcements (as set forth in Section 2.3), Limitation

# LOT AGREEMENT

Announcements (as set forth in Exhibit B), and the associated dates of such announcements. The Entity acting as the LOT Administrator may change from time to time as determined by the Board of LOT Network Inc. or its successor and such change will be announced on the LOT website.

6.12. "LOT User" means an Entity that agrees to this Agreement by means of submission to the LOT Administrator. Once an Entity becomes a LOT User, it remains a LOT User for purposes of this Agreement.

6.13. "Participation Period" means, with respect to a particular LOT User and each of its Affiliates, the period commencing on the date such LOT User signs this Agreement and transmits it to the LOT Administrator and ending on the effective date of withdrawal or deemed withdrawal of such LOT User or its respective Affiliate (as set forth in Section 2) or applicable Limitation Date (as set forth in Exhibit B). A LOT User or its Affiliate may have more than one Participation Period, if it withdraws or is deemed to have withdrawn from the Agreement or issues a Limitation Announcement and subsequently re-enters into this Agreement, provided that a withdrawing LOT User under Section 2.3 may not re-enter this Agreement for a period of at least six (6) months after its withdrawal or issuance of a Limitation Announcement.

6.14. "Patent" means any patent, utility model, inventor certificate, or equivalent right, including but not limited to a design patent or design registration, and any application for any of the foregoing anywhere in the world, including originals, continuations, continuations-in-part, divisionals, results of reexamination, renewals, extensions, and reissues, and claims contained in such patent, inventor certificate, utility model, or equivalent.

6.15. "Patent Assertion" means either of the following assertions of rights under a Patent against another Entity: (i) asserting (including but not limited to via a written or oral demand) a claim of Infringement of such Patent for the primary purpose of deriving royalties or other monetary compensation under such Patent, or (ii) the commencement or subsequent pursuit of a claim, action or proceeding in a judicial, administrative or other governmental body, including but not limited to a court (in any country) or the U.S. International Trade Commission, based in whole or in part on a claim of Infringement of such Patent.

6.16. "Products and Services" means, with respect to an Entity, any and all products (hardware and software), technologies, components, and services, including but not limited to any software that is used, licensed or otherwise distributed (including as open source software) by or for the respective Entity, and all authorized copies of same. For purposes of the License granted to each Licensee, Products and Services also include any activities of the Licensee that, in the absence of this Agreement, would constitute inducement to infringe or contributory infringement (or infringement under any other analogous legal doctrine in the applicable jurisdiction) of the Licensors' respective Subject Patent.

6.17. "Subject Patents" means (i) all issued Patents and pending Patent applications owned or licensable (directly or indirectly) by a Licensor at any time during its Participation Period, and (ii) all Patents that at any time issue on or claim priority (directly or indirectly) to any such Patent under (i) above for which Licensor or any assignee, transferee or successor has or later obtains the right to license, whether during or after its Participation Period, provided that the grant of a License to an applicable Licensee does not require payment of royalties or other consideration by Licensor to third parties (except for payments among Entities that form part of Licensor or to third parties for inventions made by the third parties while employed by Licensor) unless someone other than Licensor (or its assignees, transferees or successors) agrees to pay such royalties or other consideration on behalf of the

applicable Licensee. If a Licensor has any interest in a Patent or an Entity that owns or controls a Patent (including the right to withhold consent for Patent Assertion of such Patent) at any time during its Participation Period, but does not have the right to grant licenses, releases, waivers and immunities of the full scope set forth in this Agreement, then such Patent will be considered a Subject Patent only to the extent Licensor has the right to grant licenses, releases, waivers or immunities within the scope set forth in this Agreement. Licensor grants such licenses, releases, waivers and immunities to the maximum extent it has the right to do so without requiring payment of royalties or other consideration to third parties as set forth above, and agrees to withhold consent for Patent Assertion by any Assertion Entity against any Licensee or with respect to any Licensee's Products and Services to the extent it has the right to do so. Notwithstanding the foregoing, a Patent will not be considered a Subject Patent of a financial institution as defined by 18 U.S.C. § 20 solely by reason of being held by such financial institution (i) as trustee for a beneficiary that is not an Affiliate of such financial institution, or (ii) as a result of foreclosure or enforcement of a security interest in order to transfer the Patent to a third party that is not an Affiliate of such financial institution to satisfy an underlying financial obligation based on monies lent and secured by such Patent.

6.18. "Transfer" or "Transferred" to an Assertion Entity means any of the following with respect to a Subject Patent, whether during or after a Participation Period of the applicable Licensor: (i) the assignment, sale, exclusive license, or transfer, in whole or in part, of such Patent to an Assertion Entity, whether by Licensor or any subsequent transferee or exclusive licensee of the Subject Patent, or (ii) acquisition of ownership or control of the Subject Patent by an Assertion Entity (including any circumstance in which Licensor or any subsequent transferee owning or controlling the Subject Patent is or becomes an Assertion Entity or Controlled by an Assertion Entity or in which any Assertion Entity obtains any right to enforce or otherwise make Patent Assertions of the Subject Patent), with the earliest date any Entity owning or controlling such Patent is or becomes an Assertion Entity or Controlled by an Assertion Entity being deemed to be the effective date of such Transfer. For avoidance of doubt, any condition of a License based on Transfer of a Subject Patent to an Assertion Entity will be deemed satisfied at all times following the date of first Transfer of the Subject Patent to an Assertion Entity, even if the Assertion Entity did not qualify as an "Assertion Entity" at the time of the Transfer, or if the Subject Patent is subsequently transferred to a non-Assertion Entity.

# EXHIBIT A

## Fees

A-1 Fee Schedule. The annual fee per LOT User is set forth in the following fee schedule, to be paid to LOT Network Inc. or its successor ("LOT Network") as specified on the LOT website. An Entity that joins part way through LOT Network's fiscal year will pay a pro-rata portion of the annual fee for that year. The pro-rata portion will be due at the time of signing.
Fee Schedule:

| **LOT User's Annual Revenue** | **LOT User's Annual Fee** |
| --- | --- |
| less than $5 million | Free |
| between $5 million and $10 million | Free |
| between $10 million and $25 million | Free |
| between $25 million and $50 million | $5,000 |

# LOT AGREEMENT

| | |
|---|---|
| between $50 million and $100 million | $10,000 |
| between $100 million and $1 billion | $15,000 |
| greater than $1 billion | $20,000 |

A-2 Updates. The Fee Schedule in Section A-1 of this Exhibit A may be updated from time to time by the Board of Directors of LOT Network in accordance with its Bylaws, and such updates shall not constitute an amendment of this Agreement. The current Fee Schedule will be posted on the LOT website by the LOT Administrator. LOT Network may waive or discount fees from time to time for particular LOT Users or for particular periods of time to attract new LOT Users or for other purposes approved by the Board of Directors of LOT Network in accordance with its Bylaws.

A-3 Failure to Pay Fees. If a LOT User fails to pay the annual membership fee due under this Exhibit A within ninety (90) days of receipt of an invoice, such delinquent LOT User and its Affiliates shall not receive the benefit of any Licenses to any Subject Patents assigned or otherwise transferred by any Licensor to any Entity that is not a LOT User or an Affiliate of a LOT User during a period of delinquency that extends from the date ninety-one (91) days after receipt of such invoice until such delinquency is cured.

# EXHIBIT B

## Amendments

B-1 Procedure. An amendment may be put to a vote under this Exhibit B only upon approval in writing of the Board of Directors of LOT Network Inc. or its successor ("Board") in accordance with its Bylaws. The Board will determine the amendment submission procedure and the voting procedure and may publish further details on the LOT website. Unless otherwise determined by the Board, the following voting procedure will apply. Following approval of putting an amendment up for vote by the Board as set forth above, the then-current LOT Users qualified to vote will be notified of a proposed amendment via email with no follow-on hardcopy (notwithstanding Section 5.9). Such LOT Users will have 30 calendar days to vote by responding by email to the LOT Administrator at the following email address: admin@lotnet.com. If a LOT User fails to vote within the time period designated, the LOT User's vote will not be counted. If a LOT User joins while an amendment is pending, that LOT User will be permitted to vote on the amendment that is currently pending but the time period to vote will not be extended for such LOT User.

B-2 Approval. Amendment of this Agreement requires vote in favor of the amendment by at least eighty percent (80%) of all LOT Users who timely vote and who, at the time of the vote, are within their Participation Period, have not submitted a Limitation Announcement or announcement of the LOT User's intent to withdraw, have paid any fees due under Exhibit A, and own at least one active, issued US patent in the USPTO assignment database that is a Subject Patent. The terms of an amendment shall take effect upon the date of such approval (the "Amendment Effective Date") which will be published on the LOT website. Notice of such approval will also be given to all LOT Users via email with no follow-on hardcopy (notwithstanding Section 5.9). Upon taking effect, such amended terms shall apply with respect to and amend this Agreement regarding any LOT User and its Affiliates who, by the end of the Publication Period, have not issued a Limitation Announcement as specified below in Sections B-3 of this Exhibit B.

# LOT AGREEMENT

B-3 Dissenting LOT User May Submit a Limitation Announcement. The terms of the amendment shall be published on the LOT website for a period of sixty (60) days after it is approved (the "Publication Period"). Any LOT User that voted against the adoption of such amendment (a "Dissenting LOT User") may submit a written announcement signed and submitted by an authorized representative of the Dissenting LOT User to the LOT website before the end of the applicable Publication Period declaring the Dissenting LOT User's intent to limit the scope of its participation under this Agreement to the terms in effect immediately prior to the Amendment Effective Date and to the Patents of itself and its Affiliates that are Subject Patents hereunder immediately prior to the Amendment Effective Date ("Limitation Announcement"). Any such amended terms shall not apply with respect to any LOT User and its Affiliates who, on or before the end of the applicable Publication Period, have issued a Limitation Announcement. The existence of each Limitation Announcement and the date of its submission will be published on the LOT website.

B-4 Scope of Rights Upon Limitation. The Licenses granted to and by a Dissenting LOT User and its Affiliates will be subject to the terms and conditions of this Agreement in effect immediately prior to the applicable Amendment Effective Date ("Limitation Date"). The Licenses granted to a Dissenting LOT User and its Affiliates will remain in effect after the applicable Limitation Date only with respect to Patents that are Subject Patents of Licensors as of the Limitation Date, including those Transferred to an Assertion Entity after the Limitation Date. All Licenses granted to Licensees with respect to Subject Patents of the Dissenting LOT User and its Affiliates as of the applicable Limitation Date will remain in full force and effect and continue to apply to each Licensee (including those Entities that become an Affiliate of a LOT User after the applicable Limitation Date), including with respect to Subject Patents Transferred to an Assertion Entity after the Limitation Date. For avoidance of doubt, all Patents of a Dissenting LOT User or its Affiliates that are Subject Patents as of its Limitation Date shall remain Subject Patents subject to the terms and conditions of this Agreement after such Limitation Date.

Download Agreement

# SIGNATURE PAGE

By execution of this Agreement (Version 2.1 10/24/2024) through its duly authorized representative below, the Entity identified below, on behalf of itself and its Affiliates, agrees to become a party to this Agreement as a LOT User and to be bound by its terms and conditions (provided such Entity agrees that the LOT Administrator can withhold publishing that such Entity is a LOT User until the LOT Administrator can verify 1) that the individual named below as an authorized representative is in fact a duly authorized representative of the Entity identified below and 2) the Entity's contact information):

**First Name of authorized representative:**

Demitrius Whitfield

**Last Name of authorized representative:**

Demitrius Whitfield

# LOT AGREEMENT

**Title of authorized representative:**

COO

**Email**

demitrius.whitfield5@icloud.com

**Signature of authorized representative:**

Demitrius Whitfield

**Date of signature:**

11/30/2024

**Company Name**

Valor Enterprises LLC

**Company Type**

LLC / LLP / LP

**Company Address**

345 E 147th Street
345 E 147th Street
New York, NY 10451
United States

**Company Website Address**

Demitrius.Whitfield5@icloud.com

**Phone**

3475202137

**Email (if different from above):**

demitrius.whitfield5@icloud.com

**Annual Revenue**

$1M+ to $25M

**How many patents have you filed or do you own? You do not have to own any patents to join LOT Network.**

1-10

**How did you hear about us?**

Startup Grind

# LOT AGREEMENT

**Tell us about your company:**

Residential and Commercial Development

**Entry Point**

LOT Agreement

**Status**

Member