UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

Return Date: _____ DW

---------------------------------------------x

In re: Demitrius R. Whitfield

Case No. 25 - 40003 - CSS

NFC RECEIVED Debtor(s)

Chapter 7

---------------------------------------------x

## NOTICE OF MOTION

**PLEASE TAKE NOTICE**, a hearing will be held at the U.S. Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, New York 11201-1800 before the Honorable _Judge Stong_, United States Bankruptcy Judge, to consider the motion for an order granting relief as follows: _Motion for Reconsideration; Vacatur; and/or Modification of an Order or Action. Cir... Cir... Cir..._

_____

_____

_____

_____

Date of hearing: _8-19-25_   Time: _10:30 AM_

*Parties may appear by phone or video conference.*

*All hearings before Judge Lord are held by phone or video. Parties will receive hearing instructions after completing registration on eCourt Appearances.

**Register for Hearing:** All parties must register 2-3 days prior to hearing on eCourt Appearances at *https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.*

Responsive papers shall be filed with the bankruptcy court no later than seven (7) days prior to the hearing date set forth above.

Dated: _7-16-25_

Signature: _____

Print name: _Demitrius R. Whitfield_

Address: _83 Apollo St_
_Brooklyn, Ny 11222_

Phone: _347-737-0197_

Email: _ValorLLC @ icloud.com_

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
In re: Demitrius R. Whitfield

Case No. 25-40003-ess

NFCU _____ Debtor(s)          Chapter 7
------------------------------------------------------x

## APPLICATION IN SUPPORT OF MOTION

TO THE HON. Stong _____ , Bankruptcy Judge

The undersigned makes this application in support of my motion for the relief stated in the

Notice of Motion.  In support of this motion, I hereby allege as follows:

Reconsideration and/or Modification of
the NFCU and FCPB Order and/or
Consent actions to help with
making an sound desion by law.
- See the Attached Documentation -
Exhibits
1.1 & 1.2

Wherefore, Applicant prays for an Order granting the relief requested.

Dated: July 16, 2025

_____
Signature

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re: Demitrius R. Whitfield

Case No. 25 - 40003 - ess

NFCU                    Debtor(s)

Chapter 7
----------------------------------------------------------x

## CERTIFICATE OF SERVICE

The undersigned certifies that on 16 - 2025- 7 _____, a copy of the annexed Motion was served by depositing same, enclosed in a properly addressed postage-paid envelope, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York, upon *[below specify the name and mailing address of each party served]*:

Dated: 7- 6-25

Signature

|  | NEEDS | 185% TEST & POVERTY LEVEL TEST AMOUNT | EARNED INCOME | ACTUAL | ALLOWED |
|---|---|---|---|---|---|
| RESTR |  |  | D. GROSS | .00 | |
| PRE ADDED ALLOWANCE | 79.00 | | | | .00 |
| SHELTER | 1,385.00 | | STANDARD DEDUCTION | .00 | .00 |
| ENERGY | 7.05 | | 62% DEDUCTION | .00 | .00 |
| ENERGY SUPPLEMENT | 8.50 | | CHILD CARE | .00 | .00 |
| WATER | .00 | | $15 EXEMPTION | .00 | .00 |
| FUEL | .00 | | 1/3 EXEMPTION | .00 | .00 |
| PREGNANCY ALLOWANCE | .00 | | OTHER DEDUCTIONS (INCLUDES PRORATA REDUCTION AMT) | .00 | .00 |
| HOME DELIVERED MEALS | .00 | | | | |
| RESTAURANT ALLOWANCE | .00 | | E. TOTAL DEDUCTIONS | | .00 |
| OTHER NEEDS | .00 | | F. NET EARNED INCOME | | .00 |
| A. TOTAL NEEDS FOR 185% TEST | .00 | | | | |

|  |  | UNEARNED INCOME | | |
|---|---|---|---|---|
| 185% X TOTAL NEEDS | .00 | SOURCE | | AMOUNT |
| TOTAL EARNED + UNEARNED FOR 185% TEST | .00 | | | .00 |
| POVERTY LEVEL TEST | 607.50 | | | .00 |
| TOTAL INCOME FOR POVERTY LEVEL TEST | .00 | | | .00 |
| NEEDS REDUCTION DUE TO IVD SANCTION | .00 | | | .00 |
| B. TOTAL NEEDS FOR NET INCOME TEST | 1,456.60 | G. TOTAL UNEARNED INCOME UNEARNED INCOME DEDUCTION (INCLUDES PRORATA REDUCTION AMT) | | .00 |
| NEEDS REDUCTION DUE TO PRORATA SANCTION | .00 | H. NET UNEARNED INCOME | | .00 |
| C. TOTAL NEEDS FOR BUDGET DEFICIT CALCULATION | 91.50 | I. TOTAL INCOME (F + H) | | .00 |
| | | PA GRANT CALCULATION | | |
| OTHER ALLOWANCES | .00 | C. TOTAL NEEDS | | 91.50 |
| ADMINISTRATOR RENTAL ALLOWANCE | .00 | I. TOTAL INCOME | | .00 |
| | | J. BUDGET DEFICIT | | 91.50 |
| | | RECOUPMENT AMOUNT | | .00 |
| | | SEMI-MONTHLY PA GRANT | | 91.50 |

ESTE REPORTE SERA TAMBIEN DISPONIBLE EN ESPANOL          NOTE: AMOUNTS SHOWN IN ITEMS (A) AND (C) ABOVE HAVE BEEN ROUNDED DOWN.
BUDGET NUMBER:          00001

cover

P: 21, 31, 2x, 33 ... not pages/sheets

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING

File No. 2016-CFPB-0024

In the Matter of:

**NAVY FEDERAL CREDIT UNION**

**CONSENT ORDER**

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt collection activities of Navy Federal Credit Union (Respondent, as defined below) and has identified the following law violations. First, Respondent violated the Consumer Financial Protection Act of 2010 (CFPA) by making deceptive representations to consumers in connection with its debt collection activities about its intention to take legal action against delinquent debtors, its intention to contact consumers' military chains of command about consumers' debts, and the effect of delinquency or repayment on consumers' credit ratings. Second, Respondent violated the CFPA by unfairly restricting consumers' electronic account access—blocking debit cards, ATM usage, and online account functions—when the consumers had an overdrawn deposit account or delinquent credit account. Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, the Bureau issues this Consent Order (Consent Order).

# I
## Jurisdiction

1.  The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565.

# II
## Stipulation

2.  Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated October 7, 2016 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

# III
## Definitions

3.  The following definitions apply to this Consent Order:

    a.  "Affiliate" means any person that controls, is controlled by, or is under common control with Respondent.

    b.  "Board" means Respondent's duly-elected and acting Board of Directors.

    c.  "Commanding Officer Threat Letter" means a letter described in Paragraphs 29-31 and sent by Respondent to a consumer during the Relevant Period.

d. "Deceptive Debt Collection Letter" means a letter described in Paragraphs 14-18, 29-31, and 39-42, and sent by Respondent to a consumer during the Relevant Period.

e. "Effective Date" means the date on which this Consent Order is issued.

f. "Regional Director" means the Regional Director for the Southeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

g. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

h. "Relevant Period" includes the period from January 1, 2013, to the date of this Consent Order.

i. "Respondent" means Navy Federal Credit Union and its successors and assigns.

j. "Redress Eligible Consumer" means a consumer who:

   i. Made a Redressable Payment to Respondent; or

   ii. Received a Commanding Officer Threat Letter during the Relevant Period.

k. "Redressable Payment" means a payment to Respondent on a consumer debt made within 60 days of the date of a Deceptive Debt Collection Letter during the Relevant Period, with the following limitations:

    i. Redressable Payment does not include a payment where Respondent can demonstrate that the letter was undeliverable and no Deceptive Debt Collection Letter was received by the consumer;

    ii. Redressable Payment does not include a payment by an automobile insurance company or dealer;

    iii. Redressable Payment does not include a payment made as a result of a Navy Federal Credit Union refinance or consolidation loan that was applied for or initiated before the date of the Deceptive Debt Collection Letter; and

    iv. For any other payment made by a financial institution that extinguished the consumer's debt, as with a refinance or consolidation loan, Respondent may cap the Redressable Payment at $1,000.

l. "Service Provider" has the same meaning as set forth in section 1002(26) of the CFPA, 12 U.S.C. § 5481(26).

## IV
## Bureau Findings and Conclusions

The Bureau finds the following:

4. Respondent is a federal credit union with its principal place of business in Vienna, Virginia.

5. As of December 31, 2015, Respondent had $73,286,800,000 in assets.

6. Respondent is an insured credit union with assets greater than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

7. Respondent is a "covered person" as that term is defined by 12 U.S.C. § 5481(6).

8.  At all times relevant to this Consent Order, Respondent offered and provided a wide range of consumer financial products and services, including accepting deposits and maintaining deposit accounts, extending credit, servicing loans, and collecting debt related to consumer financial products and services.

9.  Membership in Navy Federal Credit Union is limited to people who are or have been United States military servicemembers, Department of Defense civilian employees or contractors, U.S. government employees assigned to Department of Defense installations, and their immediate family members.

## Findings and Conclusions as to Deceptive Debt Collection Letters

10. Respondent generally handles its debt collection activities using Navy Federal Credit Union employees up to the point of litigation. Its primary collection activities are telephone calls and letters to delinquent and overdrawn members.

11. From at least January 1, 2013, until after Respondent learned of this investigation, Respondent's compliance controls and employee training regarding debt collection communications were inadequate.

12. Respondent made deceptive representations to hundreds of thousands of consumers in the course of attempting to collect on consumer debts.

13. Among Respondent's many debt collection letter templates in use at various times since at least January 1, 2013, several contained material representations that were likely to mislead reasonable consumers, including the following:

## *Letters Threatening Legal Action*

14. In several letter templates, Respondent made representations threatening legal action against the consumer because of the consumer's delinquency on a Navy Federal Credit Union account.

15. Some letters stated that legal action had "been recommended."

16. Some letters stated that if the consumer failed to make a payment, Respondent would "have no alternative but to recommend [the account] for legal action."

17. Many of the letters threatened garnishment of wages—a remedy generally unavailable to Respondent without a court judgment against the consumer.

18. Between January 2013 and July 2015, Respondent sent letters to approximately 193,000 consumers creating the net impression that Respondent intended to sue the consumers if they failed to remit payment as instructed in the letter.

19. The reality, however, was that Respondent seldom recommended or took legal action against its members.

20. During the same period that these letters were sent to about 193,000 consumers, Respondent filed fewer than 5,000 debt collection lawsuits against its members.

21. In a sample of 239 accounts involving consumers who did not communicate with or remit funds as demanded by Respondent in a problematic letter, Respondent filed just eight debt collection lawsuits.

22. Respondent's process for evaluating accounts for potential legal action was not sufficiently connected to or coordinated with the separate process for determining when to send letters to consumers threatening legal action.

23. Rather than engage in any account-specific review prior to sending such a letter, Respondent treated all charged-off accounts "recommended for litigation" for

purposes of sending collection letters threatening legal action. Despite that blanket treatment, a very small subset of those accounts would actually be recommended for litigation if the delinquency remained uncured.

24.    Because of the disconnect between Respondent's narrow litigation practice and its broad letter campaign, the message to consumers—pay or be sued—was inaccurate about 97% of the time, even among consumers who did not make a payment in response to the letter.

25.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

26.    As described in Paragraphs 14 through 18, in connection with its debt collection activities, Respondent has represented in collection letters, expressly or impliedly, that it intended to take legal action against consumers.

27.    In fact, in most cases, at the time Respondent made the representations, the threatened legal action was not intended.

28.    Thus, Respondent's representations, as described in Paragraph 26, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

### Letters Threatening to Contact Servicemembers' Commanding Officers

29.    One of Respondent's debt collection letters threatened to contact consumers' military commanding officers about their delinquencies if consumers did not promptly make a payment.

30.    The letter stated: "[Y]our continued failure to forward the requested funds will leave us no alternative but to forward the Certificate of Compliance covering your

loan to your commanding officer to request assistance in communicating with you."

31.  This letter was sent to approximately 115 consumers, but there is no evidence that Respondent contacted the commanding officers of any of those recipients, even those who failed to comply with the demand to forward funds to Respondent.

32.  Thus, the threat to contact consumers' commanding officers was false.

33.  If Respondent had intended to carry out its threats to contact delinquent consumers' commanding officers, Respondent lacked consumers' consent to do so.

34.  The provision in Respondent's account agreements that purported to give Respondent the right to disclose servicemembers' debts to their military commands was not consented to by consumers because the contract clause was buried in fine print, non-negotiable, and not bargained for by consumers.

35.  Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

36.  As described in Paragraphs 29 through 31, in connection with its debt collection activities, Respondent has represented in collection letters, expressly or impliedly, that it was authorized and intended to contact consumers' commanding officers about the debts Respondent was attempting to collect.

37.  In fact, at the time Respondent made the representations, Respondent was not authorized and did not intend to contact the consumers' military chains of command about the debts Respondent was attempting to collect.

38. Thus, Respondent's representations, as described in Paragraph 36, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

### *Letters Containing Misrepresentations about Credit Ratings*

39. Respondent's debt collection letters also contained misrepresentations regarding the credit consequences of falling behind on a Navy Federal Credit Union loan.

40. Some letters sent to consumers informed them: "You will find it difficult, if not impossible, to obtain additional credit because of your present unsatisfactory credit rating with Respondent."

41. Other letters stated that the recipient consumer could "repair[]" his or her "credit" or "credit reputation" by calling Respondent.

42. Respondent sent the letters to about 68,000 consumers between January 2013 and July 2015.

43. Despite the letters' express representations about consumers' credit reputations and the unavailability of credit, Respondent did not review or analyze the recipients' particular credit situations before sending the letters.

44. Respondent had no basis to assert, as it did in the letters, that the recipients of the letters would necessarily find it difficult or impossible to obtain additional credit, or that the consumers' credit reputation would be repaired if they contacted Respondent.

45. Respondent's representations about the impact of the delinquency or repayment were inaccurate for many consumers.

46. Some letters also misleadingly implied that Respondent issued a credit "rating"— as a credit reporting company would—or was offering credit "repair" services. In

fact, Respondent was merely a furnisher to credit reporting companies, and it was inaccurate for Respondent to imply that it could, itself, raise or lower consumers' credit ratings or improve consumers' access to credit.

47. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

48. As described in Paragraphs 39 through 42, in connection with its debt collection activities, Respondent has represented, expressly or impliedly, that Respondent offered credit repair services; that Respondent issued a credit rating; that a consumer's decision to settle or repay a debt would result in repairing or improving the consumer's credit history; and that a consumer's delinquency or default on a Navy Federal Credit Union debt would make it difficult or impossible for the consumer to obtain additional credit.

49. In fact, at the time Respondent made the representations, Respondent did not offer credit repair services; Respondent did not issue credit ratings; and Respondent had no basis to assert that a particular consumer's decision to settle or repay a debt would result in repairing or improving the consumer's credit history or that a consumer's delinquency or default on a Navy Federal Credit Union debt would make it difficult or impossible for the consumer to obtain additional credit from other creditors.

50. Thus, Respondent's representations, as described in Paragraph 48, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

### Findings and Conclusions as to Deceptive Debt Collection Communications over the Telephone

51.  Since at least January 1, 2013, Respondent's collections personnel have made statements that were likely to mislead consumers over the telephone, including the following:

52.  On numerous occasions, Respondent's collections personnel threatened legal action or wage garnishment as a consequence of delinquency or default even though Respondent, in the overwhelming majority of cases, did not take such action, even when consumers failed to comply with the demand to forward funds to Respondent.

53.  In addition, during some calls Respondent's collections personnel threatened to contact a consumer's military command concerning a delinquent debt even though there is no evidence that Respondent made such contacts.

54.  The threats Respondent made over the telephone were likely to mislead reasonable consumers. At the time of the phone calls, Respondent had no intention to file suit, garnish wages, or contact consumers' military employers about the debt.

55.  Threats of litigation, wage garnishment, and disclosures to consumers' military employers were not covered in Respondent's training materials and internal policies and procedures. Between January 1, 2013 and at least June 1, 2015, Respondent's quality control procedures did not address threats of litigation, wage garnishment, and disclosures to consumers' military employers.

56.  Some training manuals instructed collections personnel to obtain the consumer's commanding officer's contact information as alternative contact information for

the consumer. That instruction was not paired with sufficient guidance about not disclosing debts to third parties and not making threats Respondent could not legally take or did not intend to take.

57. Respondent lacks documentation that any employees were disciplined, reprimanded, or subject to additional training for disclosing debts to third parties or making threats Respondent could not legally take or did not intend to take.

58. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B).

59. As described in Paragraphs 51 through 55, in connection with its debt collection activities, Respondent has represented, expressly or impliedly, that it intended to file suit, garnish wages, or contact consumers' military employers about the debt.

60. In fact, at the time of the representations, the threatened actions were not intended or were actions Respondent was not authorized to pursue.

61. Thus, Respondent's representations, as described in Paragraph 59, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## Findings and Conclusions as to Unfair Electronic Account Access Restrictions

62. Respondent had a practice of freezing consumers' electronic account access and disabling certain electronic services after consumers became delinquent on a Navy Federal Credit Union credit account.

63. The account restrictions were applied at the member level, meaning that a delinquency or overdraft on one account would trigger a freeze of the consumer's

electronic account access and certain electronic services for all of the consumer's Navy Federal Credit Union accounts.

64. The account restrictions included disabling the consumer's debit or ATM card and all functions at ATMs.

65. The account restrictions also prevented the consumer from accessing online or mobile web platforms to check account balances, transfer funds, or make online payments—except payments to the delinquent or overdrawn account.

66. The account restrictions also prevented the consumer from adding a travel alert to the consumer's accounts through mobile platforms.

67. The account restrictions also prevented consumers from having Social Security Administration verification requests processed, impeding consumers' ability to have their eligibility determined for certain Social Security benefits.

68. The timing of the restrictions depended on the risk level assigned to the account, with some electronic access freezes taking effect after just a few days of delinquency. Since January 1, 2013, about 36,000 consumers had their accounts restricted after being delinquent for 1-5 days; about 480,000 consumers had their accounts restricted after being delinquent 6-16 days; and about 180,000 consumers had their accounts restricted after being delinquent 17 or more days.

69. Respondent did not provide adequate notice to consumers of an impending electronic freeze.

70. In most cases, consumers could not regain their electronic services until after they settled their debt or made arrangements with Respondent.

71. Until mid-2015, Respondent did not make an exception for accounts containing protected federal benefits, such as Social Security Income and veterans' benefits.

Those funds, like all other funds, could not be transferred online or accessed through a bank card or ATM machine while the electronic restrictions were in place.

72. In June and July 2015, during the Bureau's investigation of this issue, Respondent stopped imposing these electronic access restrictions on delinquent members.

73. Section 1036(a)(1)(B) of the CFPA prohibits "unfair, deceptive, or abusive" acts or practices." 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if "(A) the act or practice or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

74. As described in Paragraphs 62 through 71, from at least January 1, 2013 until it ended the practice in mid-2015, Respondent unfairly restricted consumers' electronic account access and electronic account services, on all of the consumers' accounts, when the consumers were delinquent on a Navy Federal Credit Union credit account.

75. Respondent's acts and practices caused or were likely to cause substantial injuries to consumers.

76. The injuries to consumers included, but were not limited to:

   a. Interfering with consumers' ability to make purchases or withdrawals using their debit or ATM cards;

   b. Interfering with consumers' ability to make deposits through ATMs,

c. Preventing consumers from managing their accounts online or through ATMs; and

d. Preventing consumers from initiating electronic transfers or payments from or between their Navy Federal Credit Union accounts

77. The injuries to consumers were not reasonably avoidable because Respondent's policies and practices regarding electronic access and service restrictions were not adequately disclosed to consumers when they opened their deposit accounts, when they opened their credit accounts, or before they became delinquent on a ~re~ it account.

78. The injuries to consumers were not outweighed by any countervailing benefits to consumers or to competition.

79. Thus, Respondent's electronic account access restriction activities, as described in Paragraph 74, constitute unfair acts or practices in violation of sections 103 a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## ORDER

### V

### Conduct Provisions

IT IS ORDERED, under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 65, that:

80. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, as follows:

a. Cease and desist from making any deceptive representations in any debt collection communication to a consumer, whether by telephone, letter, or other means, including any misleading, false, or unsubstantiated threats to contact a consumer's commanding officer, threats to initiate legal action or wage garnishment, or misrepresentations regarding the credit consequences of falling behind on a Navy Federal Credit Union loan.

b. Cease and desist from engaging in any unfair act or practice involving restricting a consumer's electronic account access when the consumer is delinquent or overdrawn on any Navy Federal Credit Union account.

81. Respondent, and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with servicing or collecting any consumer debt, may not misrepresent, or assist others in misrepresenting, expressly or impliedly, Respondent's legal authority or intention to:

a. Take legal action against a consumer;

b. Garnish a consumer's wages;

c. Contact a consumer's commanding officer or military employer concerning the consumer's debt; or

d. Disclose a consumer's debt to a third party.

82. Respondent, and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with servicing or collecting any consumer debt, may not misrepresent, or assist others in misrepresenting, expressly or impliedly,

a. That a consumer can repair his or her credit reputation by contacting Respondent about a debt;

b. That Respondent issues a credit rating;

c. That a consumer's decision to settle or repay a debt will result in repairing or improving the consumer's credit history, or

d. That a consumer's delinquency or default on a Navy Federal Credit Union debt will make it difficult or impossible for the consumer to obtain additional credit from other creditors.

83. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, must take the following additional affirmative actions:

a. Remove from Respondent's consumer facing disclosures and agreements any reference to contacting employers, including military employers, about consumers' debts;

b. Maintain Respondent's current policy of not imposing the electronic account restrictions described in Paragraphs 62 through 71, or any similar restrictions at the member level, when the consumer is delinquent or overdrawn on any Navy Federal Credit Union account.

84. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained from recollecting any amount of debt that was collected from a consumer within 60 days of the date of a Deceptive Debt Collection Letter.

# VI
# Compliance Plan

**IT IS FURTHER ORDERED** that:

85. Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Respondent's policies and practices regarding consumer debt collection communications and electronic account restrictions comply with all applicable Federal consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

    a. Detailed steps for addressing each action required by this Consent Order;

    b. An explanation of Respondent's compliance management systems related to consumer debt collection, including the organizational and reporting structure of any related staff or management positions;

    c. A requirement that Respondent adopt or maintain written policies and procedures covering its policies and practices regarding consumer debt collection communications and electronic account restrictions that address compliance with applicable Federal consumer financial laws in a manner designed to prevent violations and to detect and prevent associated risks of harm to consumers;

    d. A requirement that Respondent provide regular education and training in Federal consumer financial laws for all appropriate employees and affiliated individuals involved with consumer debt collection communications and

electronic account restrictions, with t     tailored to each individual's responsibilities and duties;

e. A requirement that training activities be documented and training programs reviewed and updated at least annually to ensure that appropriate personnel are provided with relevant and pertinent information;

f. A requirement that Respondent adopt and implement or maintain appropriate procedures for monitoring Respondent's consumer debt collection communications and electronic account restrictions and taking corrective action where appropriate to ensure compliance with applicable Federal consumer financial laws and the terms of this Consent Order;

g. A requirement that Respondent conduct annual compliance audits, reports to the Board or an appropriate Board committee and all appropriate compliance and business unit managers, to ensure that its policies and practices regarding consumer debt collection communications and electronic account restrictions are in compliance with applicable Federal consumer financial laws and the terms of this Consent Order and it is appropriately educating, training, supervising, and monitoring its collections personnel and collections activities and taking timely corrective action where appropriate; and

h. Specific timeframes and deadlines for implementation of the steps described above.

86. The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent

must make the revisions and resubmit the Compliance Plan to the Regional Director within 30 days.

87. After receiving notification that the Regional Director as made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII
## Role of the Board

IT IS FURTHER ORDERED that.

88. The Board or a committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau

89. Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

90. In each instance that this Consent Order requires the Board or a committee thereof to ensure adherence to, or perform certain obligations of Respondent, the Board must:

   a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b. Require timely reporting by management to the Board or a committee thereof on the status of compliance obligations; and

c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## VIII

### Order to Pay Redress

IT IS FURTHER ORDERED that:

deposit account $23,00 ,000 for

segregated                    o           the purpose of providing redress to Redress Eligible Consumers as required by this Section.

92. Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Regional Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise. If the Regional Director directs Respondent to revise the Redress Plan, Respondent must make the revisions and resubmit the Redress Plan to the Regional Director within 30 days. After receiving notification that the Regional Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

93. The Redress Plan must:

F

a.  Specify how Respondent will identify all Redress Eligible Consumers who will receive redress under this Consent Order;

b.  Require Respondent to compensate each Redress Eligible Consumer in the amount of that consumer's Redressable Payment;

c.  For any consumer who received a Commanding Officer Threat Letter and who is not eligible to receive at least $1,000 in compensation under Paragraph 93(b), require Respondent to provide additional compensation such that each consumer who received a Commanding Officer Threat Letter receives at least $1,00 in compensation;

d.  Provide that redress payments to Redress Eligible Consumers will be made as follows:

   i.  For any Redress Eligible Consumer who has an available Navy Federal Credit Union deposit account at the time of the redress payment, Respondent will make the redress payment via a credit to consumer's Navy Federal Credit Union deposit account. At least seven days before the credit, Respondent will mail the consumer a letter notifying the consumer of the forthcoming redress payment ("Redress Notification Letter")·

   ii.  For any Redress Eligible Consumer who does not have an available Navy Federal Credit Union deposit account at the time of the redress payment, Respondent will make the redress payment via certified or bank check, sent by mail, accompanied by a Redress Notification Letter,

e.  Provide an exemplar of the Redress Notification Letter and envelope. The letter must explain how the amount of redress was calculated; how redress will be provided; the date when redress will be provided; that the provision of the redress payment is in accordance with the terms of this Consent Order, and that the provision of the redress payment does not create a debt or increase any existing debts the consumer may otherwise owe to Respondent. The Redress Notification Letter must alert consumers that the provision of the redress payment does not prevent Respondent from engaging in lawful collection activities as to where debt(s) the consumer may owe to the credit union. Respondent must not include any envelope containing a Redress Notification Letter any materials other than the approved letters and redress checks (where applicable), unless Respondent has obtained written confirmation from the Regional Director that the Bureau does not object to the inclusion of such additional materials;

f.  Provide the process for mailing Redress Notification Letters and redress checks (where applicable), obtaining a current address for all Redress Eligible Consumers, tracking any returned letters and redress checks, and re-mailing any returned letters and redress checks;

g.  Require Respondent to promptly update any information furnished to a credit reporting agency regarding a consumer account affected by this Consent Order;

h.  Require reporting to the Board or a relevant committee thereof and Regional Director on the status and progress of the Redress Plan on a monthly basis until completed;

i.  Specify the timeframes and deadlines for implementation of the steps described above;

j.  Provide that nothing in the Redress Plan creates any new collection, credit reporting, or litigation rights on behalf of Respondent and

k.  Provide that Respondent will pay all costs of administering redress as required by this Section.

94.  Respondent must provide all relief to Redress Eligible Consumers required by this Consent Order, regardless of whether the total of such relief exceeds the amount reserved or deposited into a segregated account under Paragraph 91.

95.  Respondent may not condition the payment of any redress to any Redress Eligible Consumer under this Consent Order on that consumer waiving any right.

## IX
## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

96.  Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $5,500,000 to the Bureau.

97.  Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

98.   The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

99.   Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.   Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.   Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including, but not limited to, payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order

100.  To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

# X
## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

101.   In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

102.   Respondent must relinquish  l dominion, control, and title to the funds paid to       to      extent  limited by law a i no  t           may be retur         Respondent.

103.   Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

104.   Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

# XI
## Reporting Requirements

**IT IS FURTHER ORDERED**

105. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or Affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case, no later than 14 days after the development.

106. Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with Respondent.

107. Respondent must report any change in the information required to be submitted under Paragraph 106 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner

108. Within 90 days after receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan, and again one year written thereafter, Respondent must submit to the Regional Director an accurate compliance progress report (Compliance Report) that has been approved by the Board, which, at a minimum:

   a. Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

   b. Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII
## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

109.    n 30 days of the Effective Date, Respondent must deliver a copy of this

Consent Order to each of its board members and executive officers, as well as to

any managers, employees, Service Providers, or other agents and representatives

who have res        ilities related to the subject matter of the Consent Order.

110.    For 5 years from the Effective Date, Respondent must deliver a copy of this

Consent Order t    ny business entity resul        y.c    in structure

referred to in Section XI, any future board members and executive officers, as

as to any managers, employees, Service Providers, or other agents and

representatives who will have responsibilities related to the subject matter of the

Consent Order before they assume their responsibilities.

111.    Respondent must secure a signed and dated statement acknowledging receipt of a

copy of this Consent Order, ensuring that any electronic signatures comply with

the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of

delivery, from all persons receiving a copy of this Consent Order under this

Section.                        I

## XI I
## Recordkeeping

**IT IS FURTHER ORDERED** that:

112.    Respondent must create, or if already created, must retain for at least 5 years

from the Effective Date, the following business records:

   a   All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

   b.   All documents and records pertaining to the Redress Plan, described in Section VIII above; and

   c.   Copies of all consumer debt collection letter templates; telephone scripts; policies and procedures; training materials; monitoring procedures, results, and reports; records of corrective actions; and audit reports.

113. Respondent must make the documents identified in ¶ 112 available to the Bureau upon the Bureau's request, within 14 days of such a request.

## XIV
## Notices

**IT IS FURTHER ORDERED** that:

114. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re Navy Federal Credit Union,* File No. 2016-CFPB-0024," and send them either:

   a.   By overnight courier (not the U.S. Postal Service) to the below address and contemporaneously by email to Enforcement_Compliance@cfpb.gov:

> James Carley
> Regional Director, Bureau Southeast Region
> Consumer Financial Protection Bureau
> 1625 Eye Street, N.W. 4th Floor
> Washington, DC 20006; or

b.  By first-class mail to the below address and contemporaneously by email

to Enforcement_Compliance@cfpb.gov:

James Carley
Regional Director, Bureau Southeast Region
Consumer Financial Protection Bureau
1700 G Street, N.W.
Washington, DC 20552
Attn. 1625 Eye Street, N.W.

## XV

### Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this

Consent Order:

115    Within 14 days of receipt of a written request from the Bureau, Respondent must

submit additional Compliance Reports or other requested information, which

must be made under penalty of perjury; provide sworn testimony; or produce

documents.

116.    Respondent must permit Bureau representatives to interview any employee or

other person affiliated with Respondent who has agreed to such an interview. The

person interviewed may have counsel present.

117.    Nothing in this Consent Order will limit the Bureau's lawful use of civil

investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVI

### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

122. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

123. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is not appealed or is upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

124. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

125. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

126. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent

Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

127. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

128. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this _11_th day of October, 2016.

Richard Cordray
Director
Consumer Financial Protection Bureau

WHEREFORE, I respectfully request that this motion/petition be denied.

I affirm this _9_ day of _9_____, _2024_ under the penalties of perjury under the laws of New York which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
**[sign your name]**

Demitrius R. Whitfield
_____
**[print your name]**

2

INDEX NUMBER No 100633-2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of
Demitrius R Whitfield
_____
                                    Plaintiff(s) / Petitioner(s)

- against -

Navy Federal Credit Union
_____
                                    Defendant(s) / Respondent(s),

        To the best of my knowledge, information and belief, formed
after an inquiry reasonable under the circumstances, the presentation
of these papers and the contentions therein are not frivolous as defined
in subsection (c) f section 130-1.1 of the Rules of the Chief
Administrator (CRR).(22)

Sign Name: _____

Print Name: Mit a Ruishield

Address: 345 East 14th Street
         Bronx, NY 10451

Telephone: 917 - 721 - 0580

Service of a copy of the within is hereby admitted

Dated: 9-9-                                    2024

Attorney for Demitrius R Whitfield

*************************NOTICE OF ENTRY*********** **************

Sir/Madam:
    Please take notice that the within is a (certified) true copy of a
_____
duly entered in the office of the clerk of

the within named court on the _____ day of
_____ 20____

Dated:

                                    Yours, etc.

Attorney for: _____

                              Office and Post

                              Office Address

To:
Attorney(s) for

********************NOTICE OF SETTLEMENT****************************

Sir/Madam:
Please take notice that an _____
of which the within is a true copy will be presented for settlement
to the ____ on ____ H ____ one  f the Justices
of the within court, at _____ 20____ at _____ AM/PM. on

Dated: _____ 20____

Presenting Party _____

To: _____
Attorney(s) for _____

118. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

119. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

## XVII
## Administrative Provisions

120. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 121.

121. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its Affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.